UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

-----------------------------------------------------------------------------------

MELISSA BRANDAO,

                               Plaintiff,

      -against-

HERDDOGG, INC., O'LEARY VENTURES MANAGEMENT, LLC,
WONDER FUND NORTH DAKOTA, LLLP, LOU FAUST,
KEVIN O'LEARY, PAUL PALANDJIAN, ANDREW UDEN,
SHANE SHULZ, ROB SHULTZ, DEAN DIDATO,
EDWARD HAMBURG, JASON WRONE, JOHN MOYES,
JEFFREY MITCHEL, SCOTT SHAMBO, BETH HAMMAR,
and DOES 1-10,

                               Defendants.

-----------------------------------------------------------------------------------

_____ cv _____

**COMPLAINT**

*JURY TRIAL
DEMANDED*

Plaintiff, by her undersigned counsel, alleges:

## SUMMARY OF THE ACTION

1.      Plaintiff Melissa Brandao is the inventor and entrepreneur who founded Defendant Herddogg, Inc. ("HerdDogg" or the "Company") in 2015 as its sole owner and director.  This action arises from a complex and ongoing racketeering conspiracy aimed at Plaintiff and perpetrated by insiders and affiliates of the Company, together with external investor entities associated with television personality and investor Kevin O'Leary.

2.      At its core, the scheme involves the fraudulent misappropriation of intellectual property, the coercive ousting of the company's founder, and the continued pursuit of state and federal economic development funds through materially false representations.

3.      Beginning in or around 2019, other officers and directors of HerdDogg initiated a series of actions designed to seize control of the company's core patents and deprive Plaintiff of

her ownership stake and corporate rights. These actions included the forgery of patent assignments submitted to the United States Patent and Trademark Office, fraudulent misrepresentations to private investors, and efforts to prevent Plaintiff from participating in shareholder governance or obtaining redress through corporate processes.

4.      In or around 2023 and continuing into 2024, affiliates of Kevin O'Leary—specifically, O'Leary Ventures and Wonder Fund North Dakota, under the direction of Paul Palandjian—joined the scheme by investing in HerdDogg and aligning with its insiders. Despite being informed directly by Plaintiff's counsel of the forgery and fraud underlying the company's offering materials, these parties dismissed the warnings and continued to facilitate the cover-up. Their actions—including refusals to accept proxy proposals and active suppression of shareholder rights—demonstrate their knowing participation in the racketeering enterprise.

5.      These events follow a pattern. In a separate and earlier investment managed by the same O'Leary affiliates, public records reflect that a failed portfolio company located in Montana called LandTrust was covertly removed from the O'Leary group's investment roster following a backdoor, taxpayer-funded bailout by the State of North Dakota.

6.      Essentially, rather than face losses or public embarrassment, the O'Leary group arranged for the state to buy out their position in LandTrust at its initial cost, creating a false impression of a non-loss-making public-private collaboration while actually leaving North Dakota taxpayers to bear the losses of the O'Leary group's failed investment in a Montana business.

7.      The HerdDogg investment mirrors this prior fraud by the O'Leary group. The same individuals and entities, now in league with the original group of HerdDogg directors and

officers who stole the Company from Plaintiff, sought to create the illusion of innovation, scale, and impact sufficient to again extract public money from North Dakotans—despite no viable product, no scalable business model, and no meaningful connection to that state. But even HerdDogg's limited and falsified financial disclosures reflect only year after year of failing revenue, uncommercialized inventory, and soaring legal and professional expenses.

8.    The real business of HerdDogg, as orchestrated by the insiders and investors who have corrupted it, is fraud.  And the targets of the Defendants' ongoing racketeering scheme have expanded far beyond just Plaintiff and the other shareholders in the company—as it stands now, every counterparty to a transaction with Herddogg, whether it be a new employee, vendor, customer, private investor, or government funding agency like the North Dakota Development Fund, is really just another victim being unwittingly fleeced by the conspirators.

9.    Plaintiff brings this action to halt the ongoing injury caused by Defendants' fraudulent enterprise, to vindicate her rights as founder, shareholder, and inventor, and to expose and remedy the broader RICO/COCCA conspiracy now implicating state and federal funds and a continuing pattern of deceptive conduct.

10.    Plaintiff brings this action seeking damages and injunctive relief sufficient to remedy prior and ongoing injuries and prevent further misconduct in connection with the scheme Defendants have been continuously conducting since at least 2019, pursuant to: the Racketeer Influenced Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*; the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; the federal patent infringement statutes, 35 U.S.C. §§ 271 *et seq.*; the Colorado Organized Crime Control Act ("COCCA"), Colorado Revised Statutes ("C.R.S."), 18-17-101*et seq.*, the Colorado civil theft statutes, C.R.S. 18-4-401 *et seq.*; and common law conversion and fraud.

**JURISDICTION AND VENUE**

11.    This Court has original subject matter jurisdiction over Plaintiffs' federal claims under the RICO Act, the CFAA, and the federal patent infringement statutes pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiffs' pendent state law claims pursuant to 28 U.S.C. § 1367(a).

12.    Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district, and pursuant to 28 U.S.C. § 1400(b) because Defendants  committed acts of infringement in this district and have regular and established places of business in this district.

**PARTIES**

13.    Plaintiff Melissa Brandao is a resident of Montana.

14.    Defendant HerdDogg, Inc. ("HerdDogg" or the "Company") is a Delaware corporation with a purported principal place of business at 612 Seward Street, Seward, Nebraska.  However, at the time of the relevant events, the Company's principal place of business was in Longmont, Colorado.

15.    Defendant O'Leary Ventures Management, LLC ("O'Leary Ventures") is a Delaware corporation with its principal place of business in Boston, Massachusetts.

16.    Defendant Wonder Fund North Dakota, LLLP ("Wonder Fund") is a North Dakota Limited Liability Limited Partnership with its principal place of business in Bismarck, North Dakota.

17.    Defendant Lou Faust is the former Chief Executive Officer of HerdDogg and a resident of Broomfield, Colorado.

18.     Defendant Kevin O'Leary is the Chairman of Defendant O'Leary Ventures and a resident of West Palm Beach, Florida.

19.     Defendant Paul Palandjian is the CEO of Defendant O'Leary Ventures and a resident of Miami, Florida.

20.     Defendant Andrew Uden is the Chief Executive Officer of HerdDogg and a resident of Nebraska.

21.     Defendant Shane Shulz is a Director of HerdDogg and resident of Longmont, Colorado.

22.     Defendant Rob Schultz is a Director of HerdDogg and resident of Park City, Utah.

23.     Defendant Dean Didato is a Director of HerdDogg and resident of Memphis, Tennessee.

24.     Defendant Edward Hamburg is a Director of HerdDogg and resident of Chicago, Illinois.

25.     Defendant Jason Wrone is a Director of HerdDogg and resident of Effingham, Illinois.

26.     Defendant John Moyes is Senior Technical Officer of HerdDogg and a resident of Boulder, Colorado.

27.     Defendant Jeffrey Mitchel is Chief Technology Officer of HerdDogg and a resident of Westminster, Colorado.

28.     Defendant Scott Shambo is Chief Operating Officer of HerdDogg and a resident of Louisville, Colorado.

29.    Defendant Beth Hammar is Office Manager of HerdDogg and a resident of Sparks, Nevada.

30.    Defendants Does 1-10 are other persons employed by or associated with the other defendants who participated in the misconduct against Plaintiffs alleged herein, and whose identities are unknown by Plaintiffs, but are presumed to be either known by one or more of the named defendants, or otherwise identifiable in discovery.

## FACTS

### I.    Plaintiff's Career Prior to Founding HerdDogg

31.    Plaintiff Melissa Brandao is an inventor and entrepreneur with a long professional track record that, prior to the events leading to this lawsuit, had established her as an expert and innovator in the agricultural technology field who is possessed of an unusually deep and wide range of complementary experience in international trade and finance.

32.    Ms. Brandao is a multi-patent holder in livestock technologies with deep expertise in hardware, data science, and product design. She has developed advanced monitoring devices—including ear tags, nose rings, and body badges—that enable remote sensing across species and generate data on livestock well-being, early pregnancy, and illness detection.

33.    Plaintiff began her career in the early 1990s as a pioneer of Apple Computer's tech database division.  By the middle of that decade, she had been recruited to become a managing director of EMIS, a major institutional investor company, for which she led groundbreaking emerging-markets analysis functions in Moscow and Sao Paulo, and during those assignments she also became fluent in Russian and Portuguese.  The latter position in

turn led to a role in Silicon Valley with the U.S. arm of Brazilian telecoms company Embratel, which was subsequently purchased by MCI.

34.     By 2005, Plaintiff had developed the financial, reputational, and relational resources to pursue her longstanding entrepreneurial ambitions, and she founded and launched her first AgTech business, Barefoot Motors, the first female-led electric vehicle company in history.  Through that business, she developed her first invention, the Model One—the world's first all-electric quad ATV specifically designed to serve the commercial agriculture market, which was featured on the well-known Discovery channel program MythBusters.

35.     In 2012, Plaintiff founded and launched her second AgTech business, Rogue Rovers, through which she began to pivot her inventive focus from off-road electric vehicle development to the emerging field of agricultural data collection and analysis.

## II.     Plaintiff's Founding of HerdDogg and Initial IP Development

36.     In 2015, Plaintiff founded and launched HerdDogg.  By the end of 2018, Plaintiff had invented, developed, and obtained patent protection (U.S. Patent No. 10,682,062 B2) for the company's core technology, the HerdDogg ear tag, which allows for remote, wireless sensing and reporting via Bluetooth of key biological functions of livestock animals to which it is attached.  At the Company's inception, Plaintiff was the sole shareholder and director HerdDogg.

37.     Plaintiff secured exposure for her invention, and based the commercial launch of HerdDogg, through an appearance on the TV reality show America's Greatest Makers, which provided a platform for her to recruit both investors and executives who could help use the first-mover advantage she had created to grow the company into a serious competitor in the global AgTech space.

7

38.     In early December 2019, Plaintiff secured over $1.5 million in investment in the company's Series Seed (SS) fundraising round, after which she maintained majority voting control of HerdDogg,  but gained what she thought would be the benefit of the oversight and financing expertise of the new directors she awarded seats on the Company's board: Defendants Dean Didato, Shane Schulz, and Rob Shultz.

39.     Fatefully, at the insistence of those newly-added board members, Plaintiff agreed to hire a Chief Executive Officer, supposedly to allow Plaintiff to focus on development and marketing of the technology she had invented and made the foundation of HerdDogg's business.

40.     Defendant Lou Faust was hired for the role, after assuring Plaintiff that he had managed a successful founder exit of another AgTech company, and that he was otherwise skilled and capable at piloting the day-to-day administration of companies like HerdDogg, pointing to, among other things, his prior joint authorship of a book about executive management lessons he purportedly learned from Mother Teresa.

### III.    Defendant Faust and his Co-Conspirators Launch their Fraud Scheme

41.     In reality, but unbeknownst to Plaintiff until it was far too late, Defendant Faust was and is a complete charlatan. The purported exit acquisition he claimed to have engineered was in fact merely a fire-sale absorption of the remnants of Agribotix, Inc., a dying business he had driven into the ground.  His purported management tome *Mother Teresa: CEO* was in fact a craven self-promotion scheme utilizing a vanity publishing house and co-authored with another charlatan who hawks "homeopathic" oral sprays to unsuspecting customers in need of real medical treatment.

42.      But most fundamentally, Defendant Faust had no actual experience, expertise, or capability to perform as a Chief Executive Officer of HerdDogg.  Indeed, contrary to his depiction of his work at Agribotix, Faust actually had no competence whatsoever regarding issues relevant to agricultural technology businesses, or even with technology-related businesses generally.

43.      Defendant Faust routinely attempted to obscure these deficits by blaming Plaintiff for his failures while flooding board of directors meetings with presentation decks filled with dense thickets of meaningless and useless flow charts and other navel-gazing process analyses that he presumably cut and pasted from various third-party executive-management publications.

44.      Unfortunately, Defendant Faust *was* skilled at recruiting and installing other overpaid, unqualified frauds like himself to fill in an expanding group of expensive but unproductive (or counterproductive) key management positions, including Defendants John Moyes, Jeffrey Mitchel and Scott Shambo.

45.      Indeed, Defendant Faust recruited Defendants Shambo and Moyes to become HerdDogg's Chief Operating Officer and Director of Product Engineering, respectively, despite their complete absence of experience or expertise with the kind of technology that was at the core of HerdDogg's business.

46.      Over the course of 2019-2020, Defendants Faust, Moyes, Mitchel and Shambo agreed among themselves, explicitly or implicitly, through words and deeds, to conspire to drive Plaintiff out of both her management and ownership positions in HerdDogg while paying themselves salaries and bonuses the Company's financial condition could not support and obtaining substantively unearned grants of purported employee-incentive shareholdings,

all with the intention of cashing out an "exit" windfall when (they hoped) a major multinational company could be duped into paying an outsized multiple of the Company's always-negligible annual revenues to acquire it outright.

47.     During that same time frame, Plaintiff worked diligently to further develop the Company's technology, overcome its manufacturing and supply chain challenges, and market her invention (and the Company's core IP and USP), the HerdDogg ear tag to the wide range of domestic and international livestock producers she had spent a decade cultivating relationships with.

48.     Despite Plaintiff's best efforts, she could not overcome the incompetence, inattention, disinterest, and even outright hostility and abuse of Defendant Faust and the other management employees he had recruited and installed.

49.     In particular, throughout 2020, while he was still nominally a non-employee "consultant," Defendant Shambo engaged in a campaign of harassment and abuse against Plaintiff, routinely demeaning her accomplishments as the Company's founder, and even turning her accomplishments against her by baselessly asserting that Plaintiff's opinions reflected "founder's privilege" in order to deflect her input.

50.     Shambo also engaged in a campaign of unwanted and blatantly unprofessional comments about Plaintiff's physical appearance, bragging about her exclusion from male-only management and employee gatherings he organized, which he and other employees referred to as "sausage parties."

51.     Shambo was equally unprofessional in communicating with Plaintiff about the business of HerdDogg, routinely screaming at her about issues and problems that were

squarely the responsibility and fault of Defendant Faust and the other incompetent freeloaders he had recruited to dominate the Company's management team.

52.     In response to Plaintiff's continual complaints to Faust about Shambo's behavior over the course of 2020, Faust first acknowledged that Shambo was "tightly wound," and then hired a consultant at a rate of $5,000 per month to mentor Shambo, but that arrangement soon ended with no change in Shambo's behavior.

53.     In late 2020 Plaintiff, under siege from this calculated campaign of denigration and abuse, and desperate to preserve her investment and her entrepreneurial vision, agreed to Defendant Faust's suggestion that she work with an executive coach.

54.     Plaintiff was persuaded to try this approach, and indeed was initially enthusiastic about gaining insight and skills through the process, principally due to Faust's (knowingly false) statements that the purpose of the exercise was to prepare Plaintiff to take over from Faust as the Company's CEO.  In addition, Plaintiff was lured into trusting the coach as a result of her explicit acknowledgment that Defendant Shambo had an "anger management problem."

55.     In July and December 2020, the Company closed its Series A1 and A2 fundraising rounds, gaining approximately $4 million in additional investment, but diluting Plaintiff's so that she lost her majority control of voting shares.  As a consequence of these fundraising rounds, Defendants Ed Hamburg and Jason Wrone were added to the Company's board of directors.

56.     During the first half of 2021, it became clear to Plaintiff that the executive coaching process that Plaintiff had agreed to participate in was actually just another part of the Defendants' scheme to gain leverage to push her out of the business.  While the ostensible

purpose of the coaching was to assist Plaintiff, the real purpose was to covertly gain information about Plaintiff's concerns and intentions by accessing Plaintiff's corporate email account without her knowledge to review her correspondence with the executive coach, which Plaintiff had been told would remain confidential, in order to smear Plaintiff in secretive, improper meetings with the Defendant board members, and provide ammunition supporting her ouster.

57.     By February 2021, Defendant Shambo had been made an actual employee of HerdDogg with a title as Vice President, despite his consistent failure to gain control of the Company's engineering, manufacturing, and supply chain issues, tasks that he effectively outsourced to third party consultants, who in turn routinely failed to deliver usable product that could be sold to new costumers.  And Shambo reacted to his own failures by escalating his abusive misconduct toward Plaintiff, engaging in even more unhinged screaming fits, all of which Plaintiff reported to Defendant Faust.

58.     Instead of disciplining or terminating Defendant Shambo, in March 2021 Defendant Faust and the complicit board members rewarded Shambo with a cash bonus, which, together with his base salary, made him as highly-compensated as Plaintiff in terms of salary, in addition to stock grants not offered to Plaintiff, despite Plaintiff's status as a founder and C-Suite executive of the Company.

**IV.     Defendants Forge Plaintiff's Electronic Signature to Fraudulently Assign her Patents to the Stolen Inventions to HerdDogg**

59.     On May 26, 2021, Plaintiff was awarded U.S. Design Patent No. D1020130 (the "'130 Patent") as sole inventor.  Plaintiff did not intend or agree to assign the '130 Patent to HerdDogg.

60.    However, unbeknownst to Plaintiff, on that same day, while she was travelling on business for the Company in Nashville, Tennessee, Defendant Faust directed Defendant Moyes, Hammar, and/or other co-conspirators to unlawfully gain unauthorized access to Plaintiff's email account, and thereby, her DocuSign electronic signature account, and to use that unauthorized access to forge Plaintiff's electronic signature on a patent assignment document purporting to assign the '130 Patent from Plaintiff to HerdDogg, which patent assignment document was then fraudulently submitted to the U.S. Patent and Trademark Office in Plaintiff's name.

61.    During the subsequent Summer of 2021, Plaintiff began demanding that Defendant Faust and the Board of Directors provide her with a written employment agreement with an appropriate salary and stock grants, and specifically, one that reflected her more foundational and expert role as compared to Defendant Shambo.  Faust eventually responded by stating that the Company would agree to pay her an increased annual salary of $180,000 per year and to provide stock grants the next year, but Faust claimed that Plaintiff did not need a written employment agreement, because the board's approval of the terms purportedly served an identical function.

62.    In the fall of 2021, Defendant Faust began to focus on attempting to cause HerdDogg to be acquired in a 100% buyout, supposedly for a total purchase price of approximately $60 million.  Defendant Faust also informed Plaintiff that he and the board of directors had decided to promote Defendant Shambo to the role of Chief Operating Officer.

63.    As part of his plan to induce a buyer to purchase HerdDogg outright, Faust created a series of marketing materials aimed at prospective investors that wildly and fraudulently misrepresented the company's financial position and expectations.

64.     For example, as late as September 2021, Faust was telling investors that the company was on track to achieve a hockey-stick increase in revenue over the five years 2020-2024, despite knowing that actual revenue for 2021 was certain to be nearly identical to the prior year's and not the 20x multiple Faust depicted:



65.     In response, Plaintiff told Faust that his plan to sell the Company was unrealistic, given its inability to solve its manufacturing and supply chain problems or generate any kind of meaningful revenue, and that to the extent he and the board were actually interested in resolving those issues, it needed to rely on engineering expertise, not a costly and unhelpful title change for an incompetent executive like Shambo who had demonstrated a total inability to deliver results.

66.     In response, Faust did not suggest that Shambo's promotion would serve the interests of HerdDogg, but rather, tried to obtain Plaintiff's sympathy with the notion that

providing Shambo with the COO title would allow him to obtain employment in a similarly senior, c-suite role at another company.

67.    On December 7, 2021, Plaintiff was awarded U.S. Utility Patent No. 11191626 (the "'626 Patent") as sole inventor. Plaintiff did not intend or agree to assign the '626 Patent to HerdDogg.

68.    However, unbeknownst to Plaintiff, five days later, on December 12, 2021, while she was again travelling on business for the Company, this time to a trade show in Casper, Wyoming, Defendant Faust directed Defendants Moyes, Hammar, and/or other co-conspirators to unlawfully gain unauthorized access to Plaintiff's email account, and thereby, her DocuSign electronic signature account, and to use that unauthorized access to forge Plaintiff's electronic signature on a patent assignment document purporting to assign the '626 Patent from Plaintiff to HerdDogg, which patent assignment document was then fraudulently submitted to the U.S. Patent and Trademark Office in Plaintiff's name.

69.    Together, the '130 Patent and the '626 Patent, and all rights and intellectual property therein, are hereinafter collectively referred to as the "Stolen Inventions."

**V.    Plaintiff is Forced Out of Her Own Company**

70.    Over the first five months of 2022, Defendants' campaign of hostility, abuse and harassment toward Plaintiff accelerated, while Faust and the other executives he had recruited continued to run the Company into the ground financially, operationally, and reputationally.

71.    During this time, Ms. Brandao repeatedly informed Defendants that the HerdDogg product was not functional at a commercial level, with failure rates exceeding 60%. Nonetheless, she was instructed by Mr. Faust and other senior officers to travel nationwide and

present the company's technology to prospective clients, investors, and government entities—including the USDA and state small-business investment boards—as if it were field-ready. These directives persisted despite resignations from key engineers, unaddressed firmware failures, and internal testing revealing product instability.

72.     As part of their scheme, Defendants caused Plaintiff to make public representations about the efficacy and readiness of HerdDogg's product that they knew to be false, for the purpose of securing or retaining government grants, maintaining investor confidence, and inflating the company's valuation. These acts exposed Plaintiff to reputational and legal risk while Defendants insulated themselves from scrutiny.

73.     This came to a head in May 2022. Plaintiff was diligently attempting to rescue the Company's most substantial and financially important pilot ear tag deployment program at AgriBeef, the Company's only remaining prospective client that was a major livestock producer.  But instead of providing Plaintiff with the engineering and manufacturing support to fix the Company's one remaining meaningful customer relationship, Defendants Faust, Moyes, and Shambo threw up entirely manufactured roadblocks and demanded that Plaintiff divert her efforts to the creation of marketing documents for products that did not exist and could not be manufactured.

74.     As a result of these events, Plaintiff told Defendant Faust that she wanted to negotiate an amicable separation of herself from the Company, due to the intolerable nature of the hostile work environment permeating HerdDogg.

75.     Instead of negotiating such an exit agreement with Plaintiff in good faith, on May 27, 2022, Defendant Faust disingenuously promised to address Plaintiff's concerns by

utilizing the services of a workplace investigator that Faust told Plaintiff he had retained the day before.

76.    On May 30, 2022, Plaintiff spent two hours detailing the hostile work environment prevalent at HerdDogg to the workplace investigator Defendant Faust had retained, and subsequently forwarded the investigator a number of documents substantiating her complaints.  Plaintiff never heard from this investigator again, despite multiple subsequent inquiries.  Instead, Defendant Didato emailed Plaintiff to tell her that he would be her sole contact point during what he claimed was an ongoing investigation.

77.    Throughout June and the first week of July 2022, Plaintiff continued to inquire of Faust regarding her request for an amicable exit from the Company.

78.    On July 8, 2022, Plaintiff received an email attaching a purported proposal, which was in fact not an actual firm offer of any kind, but rather an aspirational intention to eventually pay her something when the Company had escaped from its insolvent and non-revenue-generating condition.

79.    On July 15, 2022, Plaintiff met with Defendant Faust in person, and proposed a concrete number of terms for her exit from the Company, including cash severance and licensing terms relating to the Company's intellectual property.

80.    On August 2, 2022, Plaintiff had a phone conversation with two members of the board, Defendants Ed Hamburg and Rob Schultz.  During this call, Hamburg and Shultz told Plaintiff that the Company was broke and could not pay her anything at all in severance.

81.    During that same call, Plaintiff explicitly told Hamburg and Schultz that she had not assigned the patents relating to the Stolen Inventions to the Company, and would not be

inclined to do so outside the context of an acceptable global settlement allowing for her amicable separation from the Company.

82.     Despite their knowledge of Faust's misconduct in procuring the forged assignments of the patents relating to the Stolen Inventions in May and December of the prior year, both Hamburg and Schultz fraudulently omitted to disclose that information, and instead allowed Plaintiff to remain ignorant of the fact that the Company had already transmitted documents to USPTO that effectively stole Plaintiff's title to her own patents.

83.      Over the next few days, the Company ran out of money, and failed to make payroll for any of its employees.

84.     On August 9, 2022, Defendant Faust informed Plaintiff that he was submitting a proposal to the board of directors that Plaintiff be terminated immediately without compensation or any termination or severance pay or written agreement.

85.     On August 12, 2022, Defendants Faust and Shane Shultz called Plaintiff and told her that she was fired.  Despite her inquiries, Plaintiff was not provided then (or ever) with any information about the work or findings of the workplace investigator the board had retained.

## VI.     Defendants Pivot from Selling HerdDogg to Fraudulently Procuring Additional Investment, Including from the U.S. Treasury and North Dakota

86.     At the end of 2022, Defendant Faust and the Defendant board members caused the Company to hire Defendant Andrew Uden as CEO to replace Faust, despite the latter remaining involved in mismanaging the business to this day.

87.     Defendant Uden had no relevant experience or expertise, and despite his family owning a 75,000 head feedlot in Nebraska, and despite the Company moving its nominal headquarters to that state to accommodate Uden (and to fraudulently take advantage of

incentives offered by that state's government), the Company had developed no meaningful business or received any meaningful revenue from counterparties in that state.

88.    Over the course of the first half of 2023, Uden, Faust, and the other Defendants fraudulently marketed the Company's A3 Fundraising Series, which closed in July of that year, by falsely claiming to prospective investors that the Company had a signed termination agreement with Plaintiff in which she released the Company from all potential claims, and that the Company possessed good title to the Stolen Inventions.

89.    Defendants repeated the same lies to prospective investors over the course of the first half of 2024 while fraudulently marketing the Company's A4 Fundraising series, which closed in June of that year.

90.    As a result of this fraudulent marketing, Defendants obtained in excess of $7 million of additional investment, while diluting Plaintiff's shareholding in the company she founded to just over 8% of its voting stock.

91.    Defendants have dissipated all of those fundraising proceeds on their own salaries, fraudulent purchases of bulk, unsalable raw materials, and fraudulent manufacturing arrangements that have left the Company with a stockpile of unsold and unmarketable finished goods.

92.    Based on the limited financial information the Company has disclosed to Plaintiff, and other information Plaintiff has been able to obtain without the benefit of discovery, Plaintiff reasonably infers that the Company's current operations are a sham meant to perpetrate a fraud on the U.S. Treasury and the State of North Dakota, by creating a false impression that HerdDogg is manufacturing products and employing productive workers in

North Dakota in order to falsely certify compliance with the requirements imposed on one of the Company's principal A3 and A4 fundraising round investors, the WonderFund.

93.    In 2024, HerdDogg undertook large-scale purchases of raw materials, totaling several million dollars by the end of Q3. These purchases were subsequently reclassified as finished goods inventory, despite the absence of any clear sales pipeline, order fulfillment activity, or documented commercialization efforts. The company's claimed inventory grew significantly, but without corresponding increases in accounts receivable, product revenue, or customer engagement.

94.    Meanwhile, HerdDogg reported negligible product revenue for the entire year, suggesting either operational failure or deliberate misreporting. Despite this, the company incurred substantial professional and legal expenses, outpacing even core operational costs in some quarters. This raises the possibility that much of the company's spending has gone toward legal work connected to unresolved IP disputes, investor disclosures, or internal governance challenges.

95.    The disconnect between HerdDogg's asset reporting, cash burn, and operational results poses serious red flags. The financials suggest a company artificially inflating its book value through unsold inventory, with no viable path to revenue—and possibly misusing investor or public funds to sustain a non-viable business model.



96.     HerdDogg's substantial expenditures in 2024 on raw materials—amounting to several million dollars—and its subsequent decision to relocate manufacturing operations to Mexico did not reflect bona fide commercial needs, but instead most reasonably indicates undisclosed self-dealing.

97.     The company has failed to identify its offshore manufacturing partner or provide documentation justifying the volume or pricing of these raw material purchases, despite the absence of meaningful revenue, sales, or production throughput.

98.     This raises the strong possibility that one or more officers, directors, or significant investors caused HerdDogg to enter into transactions that primarily benefitted other entities to which those individuals are affiliated, whether through ownership, control, or prior business relationships. These transactions may have served to enrich such parties at the company's expense, without independent oversight or fair market validation.

99.     This concern is heightened by the fact that no board minutes, investor disclosures, or audited statements to date have addressed the identity of the Mexican manufacturing partner, the terms of engagement, or any evaluation of alternative domestic suppliers.

100.     Given the known involvement of high-profile investors and venture partners, and especially Defendant O'Leary—who has substantial experience managing cross-border operations—the failure to document or disclose these arrangements cannot plausibly be attributed to mere oversight.

101.     Rather, the pattern of opaque expenditures, inflated inventory reporting, and offshore contracting suggests a possible scheme to extract value from HerdDogg through non-arm's-length transactions that provide windfall profits to insiders or related parties, while leaving the company insolvent and its public and private investors defrauded.

102.     At this time, without the benefit of discovery, Plaintiff cannot determine whether Wonder Fund was originally a *victim* of this fraud, in that it was originally unaware of Defendants' false and misleading statements about the Company possessing a release from liability from Plaintiff and good title to the Stolen Inventions, or whether it began its involvement as a *co-conspirator*, and did not care that the company remains exposed to liability and does not possess good title to the Stolen Inventions.

103.     WonderFund's potential willingness to have engaged in fraud with its HerdDogg investment may have been due to its intention to fraudulently earn management fees from the State of North Dakota while unlawfully obtaining access to and control over government incentive proceeds like the $45 million in U.S. Treasury funds that the State of North Dakota

has entrusted to Wonder Fund, regardless of any direct return (or lack thereof) from the HerdDogg investment.

104.    Finally, Plaintiff did not become aware of Defendants' misconduct in forging her signature in the DocuSign system to fraudulently assign the patents relating to the Stolen Inventions from Plaintiff to the Company until December 2023.

105.    At that time, Plaintiff was able to confirm through communications with DocuSign that she could not have been the one to access the system at the relevant times or places to effect the forged assignments at issue.  However, without further discovery from Defendants or from DocuSign via third-party subpoena practice in this action, Plaintiff cannot yet determine specifically who forged her signatures, and which protected computer was accessed at what specific time and place in order to perpetrate those crimes.

### VII.    The Expansion of the Fraud Scheme and Enterprise Corruption to Include the O'Leary Defendants' Fraudulent Procurement of Government Funds and Concealment of Losses

106.    Besides defrauding Plaintiff, one core objective of Defendants' conspiracy was to fraudulently access public investment funds intended to support legitimate small businesses engaged in productive economic activity, including funds allocated to the State of North Dakota under the federal State Small Business Credit Initiative ("SSBCI").

107.    As part of the American Rescue Plan Act of 2021, Congress reauthorized the SSBCI and appropriated $10 billion to support state-administered investment programs targeting small businesses and startups that could not otherwise access capital. North Dakota received approximately $45 million under the SSBCI program, which was to be administered through vehicles such as the North Dakota Development Fund and public-private partnerships including the Wonder Fund North Dakota, LLLP ("Wonder Fund").

108.     To qualify for these funds under both federal and state law, recipients were required to demonstrate legitimate business operations, material economic activity in the target state, and full compliance with basic corporate governance and disclosure obligations. Companies receiving indirect support through state-sponsored vehicles were further required to make truthful representations about their business status, capitalization, and intellectual property ownership.

109.     Defendants O'Leary Ventures Management, LLC and Wonder Fund North Dakota, LLLP, through their principals Kevin O'Leary and Paul Palandjian, coordinated with Defendants Faust, Uden, Didato, Shultz, and other officers and directors of HerdDogg to cause HerdDogg to submit false or misleading statements to the State of North Dakota and related entities in connection with efforts to secure funding through the Wonder Fund.

110.     These misrepresentations included, but were not limited to, fraudulent claims that HerdDogg possessed valid and unencumbered ownership of its core intellectual property portfolio, including the Stolen Inventions; that Plaintiff had executed a general release of all claims against the Company; and that HerdDogg maintained meaningful operations or employment activity in the State of North Dakota.

111.     Each of these statements was knowingly false. HerdDogg possessed no executed release from Plaintiff. Plaintiff never consented to assign her patents to the Company. HerdDogg's purported North Dakota presence was a sham. As of the relevant time period, the Company had no production or sales activity in North Dakota and employed, at most, one or two remote support workers in the state. Its so-called manufacturing operation had in fact been outsourced to Mexico.

112.    Upon information and belief, Kevin O'Leary and Paul Palandjian either knew, or deliberately disregarded, the falsity of HerdDogg's representations concerning Plaintiff's intellectual property and her alleged release. At minimum, these individuals were reckless in failing to conduct basic diligence prior to directing their affiliated entities to invest public money into HerdDogg.

113.    After Plaintiff's counsel confronted Mr. Palandjian in early 2024 with direct evidence of fraudulent patent assignments and other material misrepresentations made by HerdDogg to investors and regulators, Mr. Palandjian did not initiate any corrective action. Instead, he responded with hostility, affirmatively refused to receive or review any further information concerning Plaintiff's claims, and expressly stated that Plaintiff would never be permitted to communicate with Defendant O'Leary directly.

114.    From that moment forward, Defendants O'Leary and Palandjian became direct participants in the fraudulent scheme to defraud Plaintiff and misappropriate her inventions and equity interest in HerdDogg. By choosing to align themselves with Faust, Uden, and the other Defendant conspirators despite being placed on actual notice of the fraud, O'Leary and Palandjian knowingly joined an unlawful conspiracy to continue misleading government officials, prospective investors, and the public about HerdDogg's corporate legitimacy and intellectual property rights.

115.    Accordingly, as early as the formation of Wonder Fund's investment relationship with HerdDogg—and no later than the moment Plaintiff's counsel directly informed Defendant Palandjian of the Company's fraudulent conduct—Defendants O'Leary, Palandjian, O'Leary Ventures, and Wonder Fund North Dakota became active members of the racketeering enterprise.

Their misconduct gave rise to actionable injuries not only to Plaintiff, but also to the State of North Dakota, the United States Treasury, and the broader public whose tax dollars and trust were diverted by Defendants' fraudulent scheme.

116.    Specifically, HerdDogg and the Defendants who controlled it, along with representatives of Wonder Fund North Dakota and its affiliated agents, made representations during the Series A3 and A4 investment rounds that HerdDogg it intended to expand its operations into North Dakota, including by hiring local personnel and exploring in-state manufacturing partnerships.

117.    These representations were made, at least in part, to induce investment from the North Dakota Development Fund, which was publicly funded and specifically tasked with promoting economic development within the state.

118.    Although HerdDogg briefly hired one or more low-level remote employees in North Dakota and initiated preliminary discussions with potential in-state manufacturing vendors, the company ultimately took no material steps to establish a physical or economic presence in North Dakota.

119.    Instead, HerdDogg relocated its manufacturing operations to Mexico in or around 2023, without informing the North Dakota Development Fund board or disclosing this deviation from its earlier representations. Subsequent board materials contain no discussion of this shift, and there is no evidence that Wonder Fund North Dakota or its affiliates sought to enforce performance terms or impose consequences.

120.    These facts support the reasonable inference that Defendants' references to North Dakota job creation and manufacturing were knowingly false or recklessly misleading at the

time they were made, and were part of a broader pattern to obtain state-sponsored investment

under false pretenses, consistent with the misuse of public funds by the same actors with

respect to North Dakota's taxpayer-funded bailout of WonderFund's prior failed investment of

that state's SSBCI funds in the LandTrust entity in Montana.

### VIII.    Plaintiff Attempts to Obtain Relevant Information and Reform HerdDogg's Governance through Good Faith Exercise of her Shareholder Rights

121.    In early 2025, Plaintiff, through her counsel, submitted a formal books and

records demand through her pursuant to 8 Del. C. § 220 in early 2025.  This request sought

corporate documents necessary to evaluate HerdDogg's governance, IP assignments, fundraising

representations, and shareholder rights compliance. The company initially resisted production,

providing only limited, disorganized, and at times internally contradictory materials. Key

records—such as board resolutions, patent documentation history, and voting records—were

either withheld or produced in formats suggesting gaps or irregularities.

122.    In light of these deficiencies and the apparent years-long lapse in any shareholder

meeting, Plaintiff's counsel also demanded that the company comply with its statutory and

fiduciary obligations by calling a proper meeting of shareholders. Under mounting legal

pressure, the company finally agreed to hold a shareholder meeting. However, it refused to

circulate Plaintiff's proposed resolutions or platform items as part of the agenda, and took no

action to ensure meaningful shareholder participation beyond select insiders.

123.    Shortly before the scheduled meeting, Plaintiff's counsel was able to reach Paul

Palandjian—principal of O'Leary Ventures and a key participant in the most recent HerdDogg

investment rounds. During the call, counsel informed Palandjian of the forged patent

assignments, lack of legitimate IP ownership, and ongoing concealment of Plaintiff's shareholder

rights. Rather than express concern, investigate, or commit to any remedial action, Palandjian became defensive and accusatory, alleging that Plaintiff's representatives were trying to 'divide and conquer' the board and insisting that Plaintiff would not be allowed to speak to Kevin O'Leary directly. He ended the call by refusing to review Plaintiff's proxy proposals or accept further communication on the subject.

124.     Despite these warnings, the shareholder meeting proceeded. The company's leadership—joined by the O'Leary-aligned investors—ratified prior decisions and transactions without transparency or regard for the unresolved fraud claims. Rather than serve as a forum for corporate accountability, the meeting functioned as a performative mechanism to whitewash prior misconduct and insulate the current regime from challenge.

## IX.     Facts Specifically Pertinent to RICO and COCCA Claims

125.     This action is brought, in part, under the Racketeer Influenced and Corrupt Organizations Act ("RICO"),18 U.S.C. § 1961 et seq., and the Colorado Organized Crime Control Act ("COCCA"), Colorado Revised Statutes ("C.R.S."), 18-17-101*et seq.*, based on a pattern of racketeering activity involving multiple defendants acting in concert through an enterprise—or alternatively, through multiple related enterprises—for the purpose of misappropriating Plaintiff's intellectual property, defrauding state and federal entities of public funds, concealing the lack of commercial viability of a venture, and defrauding investors through material omissions and misrepresentations.

126.     The racketeering  enterprise alleged herein consists, in the alternative, of either: (a) an association-in-fact enterprise made up of the named defendants, including HerdDogg, Inc., its officers and directors, and its affiliated investors, including Paul Palandjian and Kevin

O'Leary, acting through O'Leary Ventures and Wonder Fund North Dakota; or (b) HerdDogg, Inc. itself as the enterprise, with the other named individuals and entities functioning as RICO/COCCA persons conducting or participating in the enterprise's affairs through a pattern of racketeering activity.

127.    The enterprise engaged in interstate commerce, including by transmitting offering materials, investor updates, financial records, and internal communications across state lines using email, wire transfers, and digital platforms. These communications constitute acts of wire fraud in violation of 18 U.S.C. § 1343, and were made repeatedly between at least 2021 and the present, including but not limited to: misrepresentations about ownership of the foundational patents; communications falsely asserting Plaintiff had executed a general release; and communications seeking additional funding under materially false pretenses.

128.    Additional predicate acts include acts of wire and/or mail fraud in connection with fraudulent applications for public funds from North Dakota's development fund and the Wonder Fund, which include the use of federal U.S. Treasury funds allocated through the State Small Business Credit Initiative (SSBCI). Upon information and belief, these included representations made to state officials and boards in North Dakota intended to induce investment by fraudulently claiming HerdDogg would establish a meaningful operational presence in the state.

129.    Further predicate acts include unauthorized access to digital accounts and/or the use of credentials to improperly reassign patent rights originally held by Plaintiff without her knowledge or consent. Upon information and belief, these unauthorized assignments occurred between mid-2021 and early 2022, in the lead-up to key investment rounds, and were used to fraudulently represent to investors that the company held undisputed rights to all intellectual property foundational to its product line.

130.     The pattern of racketeering activity is continuous and ongoing. It includes not only the historical acts of IP theft and investment fraud, but also continued concealment of material facts from investors and regulators, continued use of misappropriated assets in the company's ongoing operations, and continued pursuit of additional public investment funds. The acts are related and interdependent, reflecting a shared scheme by the enterprise members to obtain money or control by fraudulent means, and to prevent Plaintiff from interfering with that scheme.

131.     These acts are not isolated. They are part of a coordinated and deliberate course of conduct spanning multiple years and jurisdictions. The predicate acts began no later than 2021 and are continuing into 2025, involving ongoing attempts to secure funding, avoid regulatory scrutiny, and exclude Plaintiff from her rights as a founder and stakeholder. Each act of email communication, misrepresentation to government funders, and concealment of the fraudulent patent assignments constitutes a distinct racketeering act under federal law.

132.     In addition to the foregoing, the Defendants' conduct also constitutes ongoing acts of money laundering in violation of 18 U.S.C. § 1956 and § 1957. Upon information and belief, the enterprise and its members routinely engaged in financial transactions using the proceeds of racketeering activity—namely, funds obtained through wire fraud, mail fraud, and the misappropriation of Plaintiff's intellectual property. These proceeds were knowingly funneled through HerdDogg's corporate accounts and used to fund salaries, consultant payments, legal retainers, contract manufacturing, and other disbursements designed to enrich individual enterprise members or entities under their control.

133.     Each instance in which Defendants directed or authorized such a transaction, while knowing of the unlawful origin of the funds, constitutes a separate predicate act of money

laundering. This includes, but is not limited to, monthly or recurring payments made to officers, board members, affiliated consultants, and service providers throughout the period from 2021 to the present. These acts furthered the concealment and perpetuation of the enterprise's underlying frauds, and demonstrate an ongoing pattern of illicit financial management integral to the RICO enterprise's operations.

134.    In addition to the federally-prohibited predicate acts described above, Defendants' racketeering scheme also relied on the coordinate commission of multiple Colorado felonies defined as predicate acts under COCCA, including cybercrime (C.R.S. 18-5.5); forgery (18-5-104); money laundering (18-5-309); identity theft (C.R.S. 18-5-902); gathering identity theft information by deception (C.R.S. 18-5-904); and securities fraud (C.R.S. 18-51-501 and 18-51-603)

135.    Moreover,, the civil RICO claims herein also encompass the conduct of Defendants Kevin O'Leary, Paul Palandjian, O'Leary Ventures, and Wonder Fund North Dakota, who knowingly joined and advanced the broader racketeering enterprise described above. Upon information and belief, these Defendants either conspired with the existing enterprise members prior to or in the course of their investment in HerdDogg, and subsequently undertook additional predicate acts that furthered and perpetuated the unlawful scheme.

136.    From the time of their engagement with HerdDogg, O'Leary-affiliated Defendants began participating in the use of wires and mails to transmit materially false representations to both private investors and public agencies, including the State of North Dakota and the United States Department of the Treasury, about the legitimacy, commercial viability, and intellectual property ownership of HerdDogg. In doing so, they adopted and extended the preexisting fraudulent conduct of the HerdDogg insiders, while also injecting new

misrepresentations to public authorities about HerdDogg's operations, job creation potential, and manufacturing footprint—statements that were knowingly false or made with reckless disregard for the truth.

137.     Moreover, upon information and belief, the O'Leary-affiliated Defendants had already engaged in a pattern of materially similar conduct in connection with their prior investment in another venture, a Montana-based entity called LandTrust, which failed to achieve promised outcomes for North Dakota but was later subject to a covert, state-funded bailout through the North Dakota Development Fund.

138.     This action transferred the cost of Wonder Fund's failed investment in LandTrust to North Dakota taxpayers while concealing the underlying failure from the public and artificially enhancing the Wonder Fund's track record. Following this scheme, the same pattern appears to have been employed in the HerdDogg investment, positioning it to receive public funds under false pretenses.

139.     These facts support the conclusion that O'Leary, Palandjian, and their affiliated entities not only joined the existing enterprise but materially expanded its scope and capabilities by bringing with them a preexisting fraudulent scheme involving the misuse of state and federal development funds, and by leveraging the appearance of public-private partnership success to facilitate further fraud through the HerdDogg venture. This conduct constitutes a continuation of the predicate acts of wire and mail fraud, and further reinforces the continuity and relatedness of the enterprise's racketeering activities.

**X.    Defendants Continue to Loot HerdDogg and Use it to Fraudulently Raise Additional Investment while Concealing their Activities**

140.    In the months since Plaintiff's attempts to obtain a complete and accurate set of corporate board records and to meaningfully participate in a substantive shareholders' meeting were thwarted by Defendants, the Company has apparently continued to fraudulently raise additional debt and/or equity funding from investors who Defendants have continued to lie to about the Company's ownership of the Stolen Inventions and about possessing a release from Plaintiff.

141.    Indeed, over just the past few weeks, Defendants have doubled down on their fraud scheme—again—by soliciting yet more rounds of outside investment in HerdDogg to keep the scheme running, denominated as the Series A5 and A6 rounds.  Worse, it appears that one of the entities that Defendants induced to put more cash into the company is Invest Nebraska, meaning that the conspirators' scheme to find and use additional public funds to perpetuate their fraud is still ongoing.

142.    In order to fraudulently induce these latest rounds of investment in HerdDogg—which of course has also had the effect of further diluting Plaintiff's shareholding in the company—Defendants made numerous false and misleading statements in their offering materials, including, but not limited to, claims that: (a) HerdDogg owns the Stolen Inventions; (b) Plaintiff had signed a release of the Company from liability; (c) Plaintiff had signed termination non-solicitation, and non-compete agreements with the Company; and (d) the Company knew of no ongoing disputes or claims subjecting it to liability.

143.    At this point, it appears that Defendants have managed to take in approximately $15 million in investment across the four rounds of fraudulent solicitations (Series A3, A4, A5 and A6) they have conducted since 2023.

144.    In addition, it appears from an updated cap table Plaintiff can still access that Defendant Uden has been awarded additional incentive compensation in the form of company stock, despite the fact that he has performed no discernable function for the Company other than to make deceptive social media appearances in which he falsely implies that HerdDogg is a thriving, going concern, as opposed to a fraud vehicle with no meaningful revenues.

145.    Of course, Plaintiff cannot determine the extent to which Defendants have further looted the Company's remaining resources and dissipated the new funds they have fraudulently induced from investors, because HerdDogg has failed to provide any updated financial information to shareholders generally, or in response to Plaintiff's explicit written demands, for any time periods after the third quarter of 2024.

146.    As a result, Plaintiff can only determine from the updated cap table that Defendants have purportedly diluted Plaintiff's shareholding to approximately 7.5%, while increasing the ownership stake of Defendant Uden—who has done nothing but serve as a front for the Defendants' fraud scheme—to over 10% of a company he helped steal from Plaintiff.

147.    In addition, it appears that in the course of the A5 and A6 rounds, Defendants have not only diluted Plaintiff's shareholdings to an all-time low, they have also preferenced themselves and the A5 and A6 Series to such an extent that Plaintiff's shares would be effectively worthless even in the (unanticipated) event of a 100% buyout of the Company by a third party.

148.    Plaintiff has tried to resolve this matter through the use of the internal mechanisms provided for by Delaware law, and by engaging with Defendants in good faith to achieve a reasonable resolution of her concerns.  Instead of meeting their legal and moral obligations to their Company's founder, Defendants have instead attempted to use their resources and clout to squelch her inquiries and destroy her career.  As a result, Plaintiff has been left with no choice but to seek meaningful remedies and the vindication of justice for Defendants' wrongdoing from this Court.

## FIRST CAUSE OF ACTION
### Investment of Racketeering Income in Violation of 18 U.S.C. § 1961(a)

149.    Plaintiff realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

150.    Beginning in or around 2019 and continuing through the present, Defendants knowingly received income derived, directly or indirectly, from a pattern of racketeering activity as defined in 18 U.S.C. §§ 1961(1) and 1961(5), including but not limited to acts of wire fraud (18 U.S.C. § 1343), access device fraud (18 U.S.C. § 1029), identity theft (18 U.S.C. § 1028), computer fraud (18 U.S.C. § 1030), and mail fraud (18 U.S.C. § 1341).

151.    Defendants then used or invested, directly or indirectly, part or all of such income, or the proceeds of such income, in the operation of HerdDogg, Inc., or in one or more enterprises engaged in or affecting interstate commerce.

152.    Specifically, Defendants used income derived from the above-described racketeering acts to:

- fund inflated salaries and bonuses for themselves and their co-conspirators;

- fraudulently inflate HerdDogg's value in order to obtain additional investor capital;

- acquire or maintain an interest in HerdDogg and/or control of its Board of Directors;

- further conceal the fraudulent assignment of Plaintiff's intellectual property;

- carry out additional predicate acts necessary to sustain the enterprise;

- and to support and enable false and fraudulent representations to federal and state agencies, including the U.S. Treasury and the State of North Dakota, in order to unlawfully obtain or qualify for small-business grants or investment incentives that Defendants knew HerdDogg was not lawfully entitled to receive.

153.    At all relevant times, an enterprise existed within the meaning of 18 U.S.C. § 1961(4), affecting interstate commerce.

154.    Alternative Enterprise Allegations:

- In one alternative, HerdDogg, Inc. constitutes an enterprise under 18 U.S.C. § 1961(4), as it is a legal entity engaged in, and whose activities affect, interstate commerce;

- In another alternative, the Defendants formed an association-in-fact enterprise, comprised of a group of individuals and entities associated in fact, with a common purpose of looting HerdDogg's assets, stealing Plaintiff's intellectual property, misleading investors, and fraudulently claiming government funding or incentives under false pretenses.

155.    As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(a), Plaintiff has suffered injury to her business and property, including but not limited to:

- the loss of control and equity in HerdDogg,

- the loss of exclusive rights in her patented inventions,

- and reputational and financial harm stemming from the Defendants' misuse of racketeering proceeds.

156.    Plaintiff is therefore entitled to treble damages and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### SECOND CAUSE OF ACTION
### Conducting/Participating in Management of Enterprise
### Through a Pattern of Racketeering Acts in Violation of 18 U.S.C. § 1961(c)

157.    Plaintiff realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

158.    At all relevant times, an enterprise existed within the meaning of 18 U.S.C. § 1961(4), affecting interstate commerce.

159.    Alternative Enterprise Allegations:

- In one alternative, HerdDogg, Inc. constitutes an enterprise under 18 U.S.C. § 1961(4), as it is a legal entity engaged in, and whose activities affect, interstate commerce.

- In another alternative, the Defendants formed an association-in-fact enterprise, comprised of a group of individuals and entities associated in fact, with a common purpose of looting HerdDogg's assets, stealing Plaintiff's intellectual property, misleading investors, and fraudulently claiming government funding or incentives under false pretenses.

160.    The enterprise had a common purpose:

- to unjustly enrich Defendants through fraudulent appropriation and commercialization of Plaintiff's intellectual property;

- to misappropriate funds raised from investors;

- to maintain unlawful control of HerdDogg through intimidation, deception, and false representations;

- and to fraudulently induce or qualify for federal and state government grants or incentive funding intended for lawful, operational, small-business entities—despite knowing HerdDogg was insolvent, lacked genuine operations, and had obtained its intellectual property through forged documentation.

161.    Each Defendant was employed by or associated with the enterprise and conducted or participated, directly or indirectly, in the conduct of its affairs through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1) and (5).

162.    This pattern included multiple related acts of:

- Wire fraud, in violation of 18 U.S.C. § 1343;

- Computer fraud, in violation of 18 U.S.C. § 1030;

- Identity theft, in violation of 18 U.S.C. § 1028;

- Access device fraud, in violation of 18 U.S.C. § 1029;

- Mail fraud, in violation of 18 U.S.C. § 1341; and

163.    These acts were related, continuous, and constituted an ongoing threat of continued criminal activity.

164.    As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c), Plaintiff has suffered injury to her business and property.

165.    Plaintiff is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## THIRD CAUSE OF ACTION
### Conspiracy to Violate 18 U.S.C. § 1961(a) and/or (c)

166.    Plaintiff realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

167.    Beginning in or around 2019 and continuing through the present, Defendants knowingly and willfully conspired to violate 18 U.S.C. § 1962(a) and/or 18 U.S.C. § 1962(c).

168.    Each Defendant agreed to the overall objective of the conspiracy:

- to acquire income through racketeering activity and invest that income into the continued operation and control of HerdDogg; and/or

- to conduct or participate in the affairs of the enterprise through a pattern of racketeering activity.

169.    Each Defendant knowingly committed or agreed to facilitate one or more overt acts in furtherance of the conspiracy, including but not limited to:

- forging Plaintiff's patent assignments;

- making false representations to investors and regulators about ownership and liabilities;

- falsely certifying or causing others to falsely certify HerdDogg's eligibility for government incentive programs;

- concealing HerdDogg's insolvency and lack of genuine operational presence in qualifying jurisdictions;

- unlawfully accessing protected computers to facilitate theft of intellectual property.

170.     Each Defendant is jointly and severally liable for the acts of all other conspirators, including acts not specifically attributed to them individually but undertaken in furtherance of the conspiracy.

171.     As a direct and proximate result of Defendants' conspiracy to violate the RICO statute, Plaintiff has suffered injury to her business and property.

172.     Plaintiff is entitled to treble damages, costs, and attorneys' fees under 18 U.S.C. § 1964(c).


**FOURTH CAUSE OF ACTION**
**Obtaining Information by Unlawfully Accessing a Protected Computer**
**in Violation of the Computer Fraud and Abuse Act**
**18 U.S.C. § 1030(a)(2)(C)**

173.     Plaintiff realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

174.     In the course of gaining access to Plaintiff's DocuSign Signature, and subsequently using that access to forge her signature on purported, but false, assignments of the Stolen Inventions that were then fraudulently submitted to the U.S. Patent and Trademark Office ("USPTO"), Defendants intentionally accessed a computer without authorization, or exceeded authorized access, and thereby obtained information from a protected computer.

175.     As a result of Defendants' violations of 18 U.S.C. § 1030(a)(2)(C), Plaintiff has suffered damage or loss aggregating at least $5,000 in value during each of the 1-year periods following the original commission of those offenses.        .

**FIFTH CAUSE OF ACTION**
**Facilitating a Scheme to Defraud by Unlawfully Accessing a Protected Computer**
**in Violation of the Computer Fraud and Abuse Act**
**18 U.S.C. § 1030(a)(4)**

176.    Plaintiff realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

177.    In the course of gaining access to Plaintiff's DocuSign Signature, and subsequently using that access to forge her signature on purported, but false, assignments of the Stolen Inventions that were then fraudulently submitted to the U.S. Patent and Trademark Office ("USPTO"), Defendants knowingly, and with intent to defraud, accessed a protected computer without authorized access, or exceeded authorized access, and by means of that conduct furthered the intended fraud and obtained something of value.

178.    As a result of Defendants' violations of 18 U.S.C. § 1030(a)(4), Plaintiff has suffered damage or loss aggregating at least $5,000 in value during each of the 1-year periods following the original commission of those offenses.

**SIXTH CAUSE OF ACTION**
**Fraudulent Trafficking in a Password**
**in Violation of the Computer Fraud and Abuse Act**
**18 U.S.C. § 1030(a)(6)(A)**

179.    Plaintiff realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

180.    In order to gain access to Plaintiff's DocuSign Signature, and subsequently use that access to forge her signature on purported, but false, assignments of the Stolen Inventions that were then fraudulently submitted to the U.S. Patent and Trademark Office ("USPTO"),

Defendants knowingly and with intent to defraud, trafficked in Plaintiff's password, and such trafficking affected interstate or foreign commerce.

181.    As a result of Defendants' violations of 18 U.S.C. § 1030(a)(6)(A), Plaintiff has suffered damage or loss aggregating at least $5,000 in value during each of the 1-year periods following the original commission of those offenses.

**SEVENTH CAUSE OF ACTION**
**Conspiracy to Violate the Computer Fraud and Abuse Act**
**18 U.S.C. § 1030(b)**

182.    Plaintiff realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

183.    Each of the Defendants agreed to join in a plan to unlawfully gain access to Plaintiff's DocuSign Signature, and subsequently use that access to forge her signature on purported, but false, assignments of the Stolen Inventions that were then fraudulently submitted to the U.S. Patent and Trademark Office ("USPTO").

184.    One or more of the Defendants engaged in one or more overt acts in furtherance of the Defendants' conspiracy to unlawfully gain access to  Plaintiff's DocuSign Signature, and subsequently use that access to forge her signature on purported, but false, assignments of the Stolen Inventions that were then fraudulently submitted to the U.S. Patent and Trademark Office ("USPTO").

185.    As a result of Defendants' violations of 18 U.S.C. § 1030(b), Plaintiff has suffered damage or loss aggregating at least $5,000 in value during each of the 1-year periods following the original commission of those offenses.

## EIGHTH CAUSE OF ACTION
### Patent Infringement in Violation of
### 35 U.S.C. § 271

186.    Plaintiff realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

187.    Defendants sold or offered to sell the Stolen Inventions within the United States within the terms of each of the relevant patents, including, without limitation, in the course of soliciting and conducting the Company's Series A-3, A-4, A-5, and A-6 fundraising rounds.

188.    Defendants' infringement of Plaintiff's patent rights in the Stolen Inventions was willful within the meaning of 35 U.S.C. § 284.

189.    As a result of Defendants' violations of 35 U.S.C. § 271, Plaintiff has suffered damage or loss.

## NINTH CAUSE OF ACTION
### Investment of Racketeering Income in Violation of C.R.S. 18-17-104(1)(a)

190.    Plaintiff realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

191.    Beginning in or around 2019 and continuing through the present, Defendants knowingly received income derived, directly or indirectly, from a pattern of racketeering activity as defined in C.R.S. 18-17-103(3), including but not limited to: (i) federally-prohibited acts of wire fraud (18 U.S.C. § 1343); access device fraud (18 U.S.C. § 1029); identity theft (18 U.S.C. § 1028); computer fraud (18 U.S.C. § 1030); and mail fraud (18 U.S.C. § 1341); and (2) Colorado-prohibited acts of cybercrime (C.R.S. 18-5.5); forgery (18-5-104); money laundering (18-5-309); identity theft (C.R.S. 18-5-902); gathering identity theft information by deception (C.R.S. 18-5-904); and securities fraud (C.R.S. 18-51-501 and 18-51-603).

192.     Defendants then used or invested, directly or indirectly, part or all of such income, or the proceeds of such income, in the operation of HerdDogg, Inc., or in one or more enterprises engaged in or affecting interstate commerce.

193.     Specifically, Defendants used income derived from the above-described racketeering acts to:

● fund inflated salaries and bonuses for themselves and their co-conspirators;

● fraudulently inflate HerdDogg's value in order to obtain additional investor capital;

● acquire or maintain an interest in HerdDogg and/or control of its Board of Directors;

● further conceal the fraudulent assignment of Plaintiff's intellectual property;

● carry out additional predicate acts necessary to sustain the enterprise;

● and support and enable false and fraudulent representations to federal and state agencies, including the U.S. Treasury and the State of North Dakota, in order to unlawfully obtain or qualify for small-business grants or investment incentives that Defendants knew HerdDogg was not lawfully entitled to receive.

194.     At all relevant times, an enterprise existed within the meaning of C.R.S. 18-17-103(2), affecting interstate commerce.

195.     Alternative Enterprise Allegations:

● In one alternative, HerdDogg, Inc. constitutes an enterprise under C.R.S. 18-17-103(2) as it is a corporation.

● In another alternative, the Defendants formed an association-in-fact enterprise, comprised of a group of individuals

and entities associated in fact though not a legal entity within the

meaning of C.R.S. 18-17-103(2).

196.    As a direct and proximate result of Defendants' violation of C.R.S.

18-17-104(a), Plaintiff has suffered injury to her business and property, including but not

limited to:

- the loss of control and equity in HerdDogg,

- the loss of exclusive rights in her patented inventions,

- and reputational and financial harm stemming from the Defendants' misuse of

racketeering proceeds.

197.    Plaintiff is therefore entitled to treble damages and attorneys' fees pursuant to

C.R.S. 18-17-106(7).

### TENTH CAUSE OF ACTION
### Conducting/Participating in Management of Enterprise
### Through a Pattern of Racketeering Acts in Violation of C.R.S. 18-17-104(1)(c)

198.    Plaintiff realleges and incorporates by reference each and every allegation in the

paragraphs above as if the same were fully set forth herein.

199.    At all relevant times, an enterprise existed within the meaning of C.R.S.

18-17-103(2), affecting interstate commerce.

200.    Alternative Enterprise Allegations:

- In one alternative, HerdDogg, Inc. constitutes an enterprise under C.R.S. 18-17-103(2),

    as it is a legal entity engaged in, and whose activities affect, interstate commerce.

45

- In another alternative, the Defendants formed an association-in-fact enterprise, comprised of a group of individuals and entities associated in fact though not a legal entity within the meaning of C.R.S. 18-17-103(2).

201.    The enterprise had a common purpose:

- to unjustly enrich Defendants through fraudulent appropriation and commercialization of Plaintiff's intellectual property;

- to misappropriate funds raised from investors;

- to maintain unlawful control of HerdDogg through intimidation, deception, and false representations;

- and to fraudulently induce or qualify for federal and state government grants or incentive funding intended for lawful, operational, small-business entities—despite knowing HerdDogg was insolvent, lacked genuine operations, and had obtained its intellectual property through forged documentation.

202.    Each Defendant was employed by or associated with the enterprise and conducted or participated, directly or indirectly, in the conduct of its affairs through a pattern of racketeering activity, as defined in C.R.S. 18-17-103(3).

203.    This pattern included multiple related acts defined as racketeering acts pursuant to C.R.S. 18-17-103(3), including but not limited to: (i) federally-prohibited acts of wire fraud (18 U.S.C. § 1343); access device fraud (18 U.S.C. § 1029); identity theft (18 U.S.C. § 1028); computer fraud (18 U.S.C. § 1030); and mail fraud (18 U.S.C. § 1341); and (2) Colorado-prohibited acts of cybercrime (C.R.S. 18-5.5); forgery (18-5-104); money laundering (18-5-309); identity theft (C.R.S. 18-5-902); gathering identity theft information by deception (C.R.S. 18-5-904); and securities fraud (C.R.S. 18-51-501 and 18-51-603).

204.    These acts were related, continuous, and constituted an ongoing threat of continued criminal activity.

205.    As a direct and proximate result of Defendants' violation of 18-17-104(c), Plaintiff has suffered injury to her business and property.

206.    Plaintiff is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to C.R.S. 18-17-106(7).

## ELEVENTH CAUSE OF ACTION
## Conspiracy to Violate C.R.S. 18-17-104(1)(d)

207.    Plaintiff realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

208.    Beginning in or around 2019 and continuing through the present, Defendants knowingly and willfully conspired to violate C.R.S. 18-17-104(a) and/or C.R.S. 18-17-104(c).

209.    Each Defendant agreed to the overall objective of the conspiracy:

- to acquire income through racketeering activity and invest that income into the continued operation and control of HerdDogg;

- to conduct or participate in the affairs of the enterprise through a pattern of racketeering activity;

- and to submit or cause to be submitted false or misleading claims or certifications to state and federal funding authorities in order to unlawfully obtain government small-business grants or investments intended for legitimate enterprises.

210.    Each Defendant knowingly committed or agreed to facilitate one or more overt acts in furtherance of the conspiracy, including but not limited to:

- forging Plaintiff's patent assignments;

- making false representations to investors and regulators about ownership and liabilities;

- falsely certifying or causing others to falsely certify HerdDogg's eligibility for government incentive programs;

- concealing HerdDogg's insolvency and lack of genuine operational presence in qualifying jurisdictions;

- unlawfully accessing protected computers to facilitate theft of intellectual property.

211.    Each Defendant is jointly and severally liable for the acts of all other conspirators, including acts not specifically attributed to them individually but undertaken in furtherance of the conspiracy.

212.    As a direct and proximate result of Defendants' conspiracy to violate the COCCA statute, Plaintiff has suffered injury to her business and property.

213.    Plaintiff is entitled to treble damages, costs, and attorneys' fees under 18 C.R.S. 18-17-106(7).

## TWELFTH CAUSE OF ACTION
### Civil Theft in Violation of
### C.R.S. 18-4-401

214.    Plaintiff realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

215.    In the course of gaining access to Plaintiff's DocuSign Signature, and subsequently using that access to forge her signature on purported, but false, assignments of the patents to the Stolen Inventions that were then fraudulently submitted to the U.S. Patent and Trademark Office ("USPTO"), Defendants knowingly obtained, retained, or exercised control over something of value, namely the patents at issue, without authorization.

216.    When Defendants engaged in the aforesaid misconduct, they intended to permanently deprive Plaintiff of the use or benefit of the patents at issue.

217.    As a result of Defendants' violations of C.R.S. 18-4-401, Plaintiff has suffered damage or loss.

## THIRTEENTH CAUSE OF ACTION
### Conversion

218.    Plaintiff realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

219.    Defendants exercised dominion or control over the issued U.S. Patents related to the Stolen Inventions.

220.    The aforesaid issued U.S. Patents related to the Stolen Inventions belonged to Plaintiff at all relevant times.

221.    Defendants' exercise of dominion or control over the aforesaid patents was not authorized by Plaintiff.

222.    Plaintiff has demanded that Defendants cease their fraudulent exercise of dominion or control over the aforesaid patents by acknowledging that the assignments of those patents to HerdDogg, Inc. were forged.

223.    Defendants have refused to cease wrongfully exercising dominion or control over the aforesaid patents belonging to Plaintiff.

## FOURTEENTH CAUSE OF ACTION
### Fraud

224.    Plaintiff realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

225.    In the course of perpetrating their wider scheme to defraud Plaintiff out of her ownership and control of HerdDogg and the benefits of her inventions, including, without limitation, their subsidiary scheme to forge assignments of the patents to the Stolen Inventions, Defendants made multiple false representations and omissions of material facts.

226.    At the time Defendants made each such false representation or omission of material fact, they knew such representation or omission was false.

227.    The parties to whom Defendants made those false representations and omissions, including without limitation, Plaintiff, the USPTO, and prospective investors in HerdDogg, were unaware of the falsity of Defendants' representations or omissions at the time they occurred.

228.    At the time Defendants made each such false representation or omission of material fact, they intended that its recipient would act or fail to act in reliance upon it.

229.    As a result of Defendants' fraud scheme, Plaintiff has suffered damage or loss.

## FIFTEENTH CAUSE OF ACTION
### Declaratory Judgment

230.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

231.     An actual and justiciable controversy exists between Plaintiff and Defendants concerning the ownership and lawful control of certain intellectual property, the validity of certain corporate actions, and the legal obligations of the parties under federal and state law, pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure..

232.     Specifically, Plaintiff seeks a judicial declaration that: (a) Plaintiff remains the rightful owner of two foundational patents misappropriated and reassigned without consent; (b) the claimed assignments of those patents to HerdDogg  were obtained through forgery and are null and void; (c) no valid general release or termination agreement was ever executed by Plaintiff in favor of HerdDogg or any related party; and (d) all subsequent representations by Defendants regarding full and uncontested ownership of such intellectual property were materially false and should be declared invalid and unlawful.

233.     Such declarations are necessary to clarify the legal rights and status of the parties, to prevent ongoing and future harm, and to resolve substantial legal uncertainty caused by Defendants' fraudulent conduct and misrepresentations.

234.     Accordingly, Plaintiff respectfully requests that the Court issue a declaratory judgment in her favor on the matters identified above, along with such further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that a judgment and order be entered awarding the following relief:

1. For Plaintiff's First, Second, and Third Causes of Action, all brought pursuant to the RICO Act, 18 U.S.C. § 1964:

   a. An award of compensatory damages against Defendants, jointly and severally. , in an amount to be determined at trial, but reasonably believed to be no less than $50,000,000.00;

   b. An award of punitive damages against Defendants, jointly and severally, in an amount equal to twice the amount of Plaintiff's compensatory damages, pursuant to 18 U.S.C. § 1964;

   c. The appointment of a permanent receiver to manage, operate, and provide an orderly resolution of claims of ownership in, and liabilities to and of, HerdDogg, Inc.;

   d. A declaration that the Stolen Inventions are wholly and solely owned by Plaintiff, and that the purported assignments of related patents to HerdDogg, Inc. were and are void as *ultra vires*;

   e. A permanent injunction barring each of the Defendants from serving as directors or officers of any for-profit corporate entities of which they are not majority owners;

   f. A permanent injunction compelling HerdDogg, Inc. to issue public corrections to its prior false statements concerning its ownership of the Stolen Inventions;

2. For Plaintiff's Fourth, Fifth, Sixth, and Seventh Causes of Action, all brought pursuant to the CFAA, 18 U.S.C. § 1030:

   a. An award of compensatory damages against Defendants, jointly and severally. , in an amount to be determined at trial, but reasonably believed to be no less than $50,000,000.00;

   b. A declaration that the Stolen Inventions are wholly and solely owned by Plaintiff, and that the purported assignments of related patents to HerdDogg, Inc. were and are void as *ultra vires*;

c. An injunction compelling HerdDogg, Inc. to issue public corrections to its prior false statements concerning its ownership of the Stolen Inventions;

3. For Plaintiff's Eighth Cause of Action, for patent infringement in violation of 35 U.S.C. § 271:

   a. An award of compensatory damages against Defendants, jointly and severally. , in an amount to be determined at trial, but reasonably believed to be no less than $50,000,000.00;;

   b. An award of punitive damages against Defendants, jointly and severally, in an amount equal to twice the amount of Plaintiff's compensatory damages, pursuant to 35 U.S.C. § 284;

   c. A declaration that the Stolen Inventions are wholly and solely owned by Plaintiff, and that the purported assignments of related patents to HerdDogg, Inc. were and are void as *ultra vires*;

   d. An injunction compelling HerdDogg, Inc. to issue public corrections to its prior false statements concerning its ownership of the Stolen Inventions;

4. For Plaintiff's Ninth, Tenth, and Eleventh Causes of Action, all brought pursuant to the Colorado Organized Crime Control Act ("COCCA"), C.R.S. 18-17-101 *et seq.*:

   a. An award of compensatory damages against Defendants, jointly and severally. , in an amount to be determined at trial, but reasonably believed to be no less than $50,000,000.00;

   b. An award of punitive damages against Defendants, jointly and severally, in an amount equal to twice the amount of Plaintiff's compensatory damages;

   c. The appointment of a permanent receiver to manage, operate, and provide an orderly resolution of claims of ownership in, and liabilities to and of, HerdDogg, Inc.;

   d. A declaration that the Stolen Inventions are wholly and solely owned by Plaintiff, and that the purported assignments of related patents to HerdDogg, Inc. were and are void as *ultra vires*;

   e. A permanent injunction compelling HerdDogg, Inc. to issue public corrections to its prior false statements concerning its ownership of the Stolen Inventions;

5. For Plaintiff's Twelfth Cause of Action, for civil theft in violation of C.R.S. 18-4-401:

    a. An award of compensatory damages against Defendants, jointly and severally, in an amount to be determined at trial, but reasonably believed to be no less than $50,000,000.00;;

    b. An award of punitive damages against Defendants, jointly and severally, in an amount equal to twice the amount of Plaintiff's compensatory damages, pursuant to C.R.S. 18-4-405;

6. For Plaintiff's Thirteenth Cause of Action, for common-law conversion:

    a. An award of compensatory damages against Defendants, jointly and severally, in an amount to be determined at trial, but reasonably believed to be no less than $50,000,000.00;

    b. An award of punitive damages against Defendants, jointly and severally, in an amount to be determined at trial;

7. For Plaintiff's Fourteenth Cause of Action, for common-law fraud:

    a. An award of compensatory damages against Defendants, jointly and severally, in an amount to be determined at trial, but reasonably believed to be no less than $50,000,000.00;

    b. An award of punitive damages against Defendants, jointly and severally, in an amount to be determined at trial;

8. An award of prejudgment interest on compensatory damages and postjudgment interest on all damages;

9. An award of reasonable attorneys' fees and costs; and

10. Such other and further relief as the Court deems just and proper.

Dated: New Paltz, New York
     July 22, 2025

                Respectfully submitted,

                LAW OFFICE OF JOHN OLESKE

`

                by: _____/s_____
                    John Oleske
                243 Main Street, Suite 50
                New Paltz, NY 12561
                (646) 709-7538
                john@johnoleskelaw.com
                *Attorney for Plaintiff*